**UNITED STATES of America,
Plaintiff,**

**v.**

**Stephen T. CURWOOD et al., Defendants.**

**Crim. A. No. 70-205.**

United States District Court,
D. Massachusetts.

Feb. 25, 1972.

Joseph L. Tauro, U. S. Atty., Paul F. Ware, Jr., Asst. U. S. Atty., for plaintiff.

Manuel Katz, Boston, Mass., for Stephen T. Curwood.

Donald L. Conn, Malden, Mass., for Norman B. Casas.

William P. Homans, Jr., Boston, Mass., for Anthony W. King.

## OPINION

JULIAN, Chief Judge.

This case is before the Court on the motions of the defendants Curwood, Casas and King to dismiss the indictment and to suppress as evidence property seized by agents of the Bureau of Customs of the United States Department of the Treasury. Defendants stand indicted in two counts: the first charges conspiracy to receive, conceal, and facilitate the transportation of approximately 600 pounds of hashish (marihuana) which defendants knew to have been illegally imported into the United States; the second charges commission of the substantive offense. The pertinent facts are as follows.

On February 4, 1970, thirty wooden crates containing musical instruments arrived at Logan International Airport in Boston, Massachusetts, from India. Agents of the Bureau of Customs subsequently discovered that the crates also contained varying quantities of hashish secreted beneath false bottoms. A fluorescent chemical substance was applied to the hashish by agents of the Bureau of Customs and the crates were repacked for delivery. Late in the night of February 13, the thirty crates were loaded by Customs agents onto a truck owned by Frank J. Cole, Inc., a motor freight service, and were transported to Andover, Massachusetts, on February 14, 1970, by an employee of that company and Special Agent Richard G. Christopher.

Between 10:30 and 11:00 a. m. on February 14, delivery of the crates was made at 63 Park Street, Andover, Massachusetts, the designated destination of the shipment.[1] The premises at 63 Park

1. The shipment was made in two parts. Each waybill described the consignee as Afro Imports, Inc., P.O. Box 441, Lawrence, Massachusetts. On each also ap-

Street consisted of a sprawling commercial structure, two sections of which were connected by a roofed breezeway. The entire structure, apparently finished in the same building material throughout and painted barn red, housed several business concerns: a beauty parlor, a locksmith shop, and a building construction company (hereinafter Channel Building Company). The cargo was unloaded at the warehouse or storage area of Channel Building Company by the Frank J. Cole, Inc., truck driver and Agent Christopher at the direction of one of the defendants, Norman B. Casas, who signed a receipt for delivery of the 30-crate shipment. The truck then proceeded to a predetermined location where Agent Christopher entered a cruiser of the Massachusetts State Police and was driven to the home of a judge of this court in Cambridge, Massachusetts, for the purpose of securing a search warrant. During the trip from Andover to Cambridge, Agent Christopher listened via a portable radio to the transmitted observations of other agents surveilling the premises at 63 Park Street in his absence.

At approximately 12:15 p. m. the requested search warrant was issued upon the sworn affidavit of Agent Christopher. The warrant described the premises to be searched as "A Barn Red Wood Frame, 2 story Commercial Structure, 208′ long and 85′ wide situated and numbered 63 Park Street, Andover, Mass." The concealed property for which the warrant issued was described as "Hashish (marihuana)." Upon securing the search warrant, Agent Christopher immediately returned to Andover, arriving at a location near 63 Park Street at approximately 1 p. m. Surveillance of the premises by Customs agents, joined by members of the state and local police,

continued for about one hour. At 2 p. m. all three defendants were arrested, without warrants, as they stood outside the storage area of the building and near an automobile which had been backed up to the building's loading platform. Execution of the search warrant produced approximately 400 pounds of hashish. The remaining quantity—approximately 200 pounds—was seized from the trunk of the automobile, a yellow 1970 Plymouth four-door sedan, but not under the authority of the search warrant.

On February 18, 1970, Agent Desmond of the Customs Bureau, who had participated in the raid of February 14, applied for and obtained a search warrant for "one, yellow-manilla envelope" which had been sent from Afro Imports, P.O. Box 441, Lawrence, Massachusetts, to one Ravi Rikye, in care of American Express, Vienna, Austria. The asserted ground of the resultant seizure was Agent Desmond's belief that the envelope contained information related to a conspiracy to smuggle hashish into the country.

Two basic issues are raised by defendants' respective motions to dismiss the indictment and motions to suppress as evidence property seized by agents of the Bureau of Customs: 1) whether prosecution under the Narcotic Drugs Import and Export Act, 21 U.S.C. § 176a,[2] must be quashed because that statute violates defendants' privilege against self-incrimination under the Fifth Amendment to the Constitution of the United States, and 2) whether the property seized as evidence—the hashish, or any portion thereof, and/or the yellow manilla envelope—must be suppressed because the methods employed to effect its seizure violate the Fourth Amendment to the Constitution of the

pears the instruction, "Notify A & M (Customs brokers)—Logan Airport." On the invoice of defendant Curwood, supplied to A & M, the address of Afro Imports is listed both as 63 Park Street, Andover, Massachusetts, and as P.O. Box 441, Lawrence, Massachusetts. On two delivery orders instructing each of two carriers to deliver the freight to Frank J. Cole, Inc., A & M describes the address of Afro Imports as "63 Park Street, Andover, Mass. (Channel Buildings)."

2. Since repealed. Act of October 27, 1970, Pub.L. No. 91–153, § 1101(a) (2), 84 Stat. 1291.

United States. The motions, and thus the issues, will be considered *seriatim.*

### Motions to Dismiss Indictment

Defendants contend in their motions to dismiss the indictment that the statute under which they are charged, while it may be valid on its face, is constitutionally infirm in that it incorporates other federal statutes which force a compliant individual to admit to commission of crimes, both state and federal. Primary reliance is placed upon what defendants suggest are the necessary implications of four decisions of the United States Supreme Court, viz., Leary v. United States, 395 U.S. 6, 89 S. Ct. 1532, 23 L.Ed.2d 57 (1969); Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); and Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968).[3] In each case, federal statutes were held unconstitutional under the Fifth Amendment on the ground that compliance therewith required that persons implicate themselves in illegal activities. In advancing the argument, not unfamiliar to this court, that 21 U.S.C. § 176a effectively annuls the Fifth Amendment privilege against self-incrimination, defendants concede that the statute "does not of itself require any disclosure, but rather it requires incriminating disclosure through its incorporation of other statutes which call for such disclosure." Defendants' Memorandum of Law in Support of Motions to Dismiss Indictment, at 2. The incorporated provisions, according to defendants, are those of either the Marihuana Tax Act, specifically 26 U.S.C. § 4755, or the general customs laws, Title 19 of the United States Code, or both. The challenged statute reads, in pertinent part, as follows:

> "Notwithstanding any other provision of law, whoever, knowingly, with intent to defraud the United States, imports or brings into the United States marihuana contrary to law, or smuggles or clandestinely introduces into the United States marihuana which should have been invoiced, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such marihuana after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or whoever conspires to do any of the foregoing acts, shall be imprisoned . . . . ."[4]

Adverting to the alternative preconditions of illegality, i. e., importation "contrary to law" or smuggling or introduction into the United States of marihuana "which should have been invoiced," defendants suggest the necessity of reference to other statutes to determine the source of legislative proscription of the conduct alleged in the indictment. As to the requirement of invoicing, attention is drawn to various provisions of the general customs laws, e. g., 19 U.S.C. §§ 1484, 1485, and 1497, providing for the entry and declaration of articles brought into the country. As to what constitutes importation "contrary to law," defendants refer to both the general customs laws and the Marihuana Tax Act, 26 U.S.C. § 4741 et seq. Section 4755(a) (1) of the latter act provides that

---

3. With the exception of *Leary*, decided in 1969, each of these cases was cited by defense counsel in making the same argument before Wyzanski, J., in United States v. Vial, 282 F.Supp. 472, 472–473 (D.Mass.1968). In denying defendants' motion to dismiss the indictment under § 176a, the court conceded that the "argument has a certain plausibility, particularly because of the construction placed upon the majority opinions in the three cases just cited by Chief Justice Warren dissenting from the judgments in those cases." Plausibility, however, did not overcome the "strong presumption of constitutionality of acts of Congress which, after all, have always commanded a majority of each House of Congress and frequently, as here, the approval of the President of the United States."

4. 21 U.S.C. § 176a.

"[i]t shall be unlawful for any person required to register and pay the special tax under the provisions of sections 4751 to 4753, inclusive, to import, manufacture, produce, compound, sell, deal in, dispense, distribute, prescribe, administer, or give away marihuana without having so registered and paid such tax."

Defendants contend that, to the extent that 21 U.S.C. § 176a relies upon 26 U.S.C. § 4755 as the basis of illegality, an individual cannot be prosecuted under § 176a without eviscerating his vital protection against self-incrimination afforded by the Fifth Amendment. Otherwise, the privilege could be circumvented by "ingeniously drawn legislation." Marchetti v. United States, 390 U.S. 39, 52, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968).

Alternatively, defendants view the general customs laws as the fount of illegality in 21 U.S.C. § 176a. While conceding the validity of the customs registration requirements of Title 19, defendants assert that prosecution under § 176a suffers the same constitutional infirmity as described and condemned in Leary v. United States, *supra.* Simply because § 176a "uses some isolated incorporations from Title 19," it does not follow that "such odious specific legislation as § 176a," conceived as "part of the comprehensive federal scheme to control marijuana," is saved by the "gen-erality of Title 19." Defendants' Memorandum of Law in Support of Motions to Dismiss Indictment, at 4, 5.

Without passing upon the existence and precise extent of statutory interrelation among the customs laws, the tax laws, and section 176a, if indeed such incorporation as the defendants advance is demonstrable,[5] this Court concurs in the view, expressed in prior judicial responses to essentially the same constitutional challenge to § 176a,[6] that

"[i]t would be strange indeed if one could Constitutionally be required to declare ordinary merchandise at the border and be punished for failure so to do, if, at the same time, surreptitious importation of contraband does not have to be declared and a failure to declare cannot be punished. The importation is not compelled and the Fifth Amendment privilege against compulsory self-incrimination does not apply." Rule v. United States, 362 F.2d 215, 217 (5th Cir. 1966), cert. denied, 385 U.S. 1018, 87 S.Ct. 744, 17 L.Ed.2d 554 (1967).

The assertion that § 176a is unconstitutional under the Fifth Amendment because it is an indirect enforcement of the Marihuana Tax Act, held unconstitutional as applied in Leary v. United States, *supra,* relies upon a strained reading of that decision and its antecedents, Marchetti v. United States, *supra,* Grosso v. United States, *supra,* and

---

5. See Thomas v. United States, 314 F.2d 936, 939 n. 6 (5th Cir. 1963), cert. denied, 375 U.S. 849, 84 S.Ct. 105, 11 L.Ed. 2d 76 (1963); United States v. Castro, 438 F.2d 468, 471 (7th Cir. 1971). *Castro* specifically rejects the contention that § 176a necessarily incorporates the Marihuana Tax Act: " . . . the section proscribes both smuggling marihuana and the receipt of previously smuggled marihuana. The prohibition against the receipt of 'such marihuana' encompasses 'marihuana which should have been invoiced.' The statute quite plainly indicates that it is unlawful to receive marihuana knowing that it was not invoiced when imported. Thus, entirely apart from the Marihuana Tax Act, appellant's re-ceipt of the marihuana was prohibited by § 176a.

"His conviction rests on his voluntary performance of an unlawful act; it is not predicated on his failure to perform an incriminatory act. His Fifth Amendment privilege was not violated."

6. *See, e. g.,* Witt v. United States, 413 F. 2d 303 (9th Cir. 1969); Walden v. United States, 417 F.2d 698 (5th Cir. 1969); Ruiz v. United States, 328 F.2d 56 (9th Cir. 1964); Haynes v. United States, 339 F.2d 30 (5th Cir. 1964), cert. denied, 380 U.S. 924, 85 S.Ct. 926, 13 L.Ed.2d 809 (1965); Pickett v. United States, 223 F.Supp. 695 (S.D.Cal.1963). *See also* Wynn v. United States, 422 F.2d 1245 (9th Cir. 1970).

Haynes v. United States, *supra*.[7] The words "contrary to law" have been interpreted by the Supreme Court to mean "contrary to any existing, applicable law." Callahan v. United States, 285 U.S. 515, 517, 52 S.Ct. 454, 76 L.Ed. 914 (1932).[8] As the United States Court of Appeals for the Ninth Circuit stated in United States v. Scott, 425 F.2d 55, 60 (9th Cir. 1970),

> "[i]n the context of section 176a, the reference is to any existing law of the United States regulating the importation of merchandise, including marihuana, for violation of which a penalty is imposed. Those existing laws include the Marihuana Tax Act, the Customs Inspection statutes, 19 U.S.C. §§ 1461 and 1462, and the provisions of section 176a itself relating to smuggling or clandestinely introducing marihuana. (*See* 1956 U.S. Code Cong. & Adm. News, pp. 3276, 3279). Nothing in *Leary* or . . . Marchetti v. United States, [*supra*]; Grosso v. United States, [*supra*]; Haynes v. United States, [*supra*], suggests that the assertion of the privilege against self-incrimination would be a defense to a prosecution for smuggling or a defense to a prosecution for violating the general customs laws."

To extrapolate from *Marchetti, Grosso, Haynes,* and *Leary* a rule of law which would preclude prosecution for receiving, concealing, buying, selling, or facilitating the transportation, concealment, or sale of marihuana known to have been illegally imported into the United States is a step which this Court, among many others, is not persuaded to take. Reason and the weight of authority constrain the Court to conclude that defendants have failed to sustain their challenge to the constitutionality of 21 U.S.C. § 176a.[9]

Accordingly, defendants' motions to dismiss the indictment are denied.

### Motions to Suppress

Defendants' motions to suppress may be viewed in three aspects. It is first contended that the search warrant secured on February 14, 1970, by Agent Christopher, under the authority of which approximately 400 pounds of hashish were seized from the premises at 63 Park Street, failed to describe with

---

7. In *Leary,* petitioner had been indicted under 26 U.S.C. § 4744(a) (2), a subsection of the Marihuana Tax Act, and under 21 U.S.C. § 176a. In reversing the conviction, the Supreme Court held that petitioner's invocation of the privilege against self-incrimination under the Fifth Amendment provided a full defense to the charge under 26 U.S.C. § 4744(a) (2). As to 21 U.S.C. § 176a, the Court held that application of the presumption contained therein, viz., "[w]henever on trial for a violation, the defendant is shown to have or to have had the marihuana in his possession, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains his possession to the satisfaction of the jury," denied petitioner due process of law. The contention that prosecution under § 176a alone would deprive petitioner of his privilege against self-incrimination was not raised.

In *Marchetti,* the Supreme Court held that a plea of the Fifth Amendment privilege barred prosecution for failure to register and pay the occupational tax on wagers, as required by 26 U.S.C. §§ 4411–4412. Compliance with the statute would have subjected petitioner to a "real and appreciable" risk of self-incrimination.

In *Grosso,* a conviction under 26 U.S.C. § 4401, imposing an excise tax on proceeds from wagering, was reversed on the basis of the Fifth Amendment privilege.

And in *Haynes,* the same rationale mandated reversal of a conviction for possession of an unregistered weapon under the National Firearms Act, 26 U.S.C. § 5851.

8. *See also* United States v. Scott, 425 F. 2d 55 (9th Cir. 1970) ; United States v. Pyle, 424 F.2d 1013, 1015 n. 2 (9th Cir. 1970) ; Olais-Castro v. United States, 416 F.2d 1155, 1158 n. 8 (9th Cir. 1969).

9. The Court does not subscribe to defendants' characterization of such authority as "valueless" precedent. Defendants' Memorandum of Law in Support of Motions to Dismiss Indictment, at 11. The value of such decisions as hereinbefore enumerated is not necessarily to be gauged by their binding effect upon this Court.

sufficient particularity the place to be searched. Specifically, defendants claim that Christopher lacked probable cause to believe that hashish could be found anywhere in what he described as "[a] barn red wood frame, 2 story commercial structure, 208′ long and 85′ wide situated and numbered 63 Park Street, Andover, Mass." The defendants indicate that neither the warrant nor supporting affidavit named or otherwise described any of the defendants, and the warrant did not restrict the intended search to any particular part of the premises.

Defendants next challenge the constitutionality of the warrantless seizure of approximately 200 pounds of hashish from the trunk of the automobile backed up to the loading platform of Channel Building Company. According to defendants, the agent in charge of the investigation, one James R. Desmond, who ordered seizure of the automobile and removal of two footlockers containing approximately 200 pounds of hashish, acted without probable cause to believe that the automobile contained hashish which had been unlawfully introduced into the United States. Defendants deny that the seizure was incidental to their lawful arrest.

Finally, defendants move the Court to suppress the yellow manilla envelope and its contents, seized on February 18, 1970, at the Lawrence, Massachusetts, Post Office, as fruit of the allegedly unlawful search of the premises at 63 Park Street on February 14, or, in the alternative, as property seized pursuant to a warrant issued on the basis of an insufficient affidavit.

1. The Court initially notes the importance of the physical characteristics of the premises described in the search warrant of February 14 to appropriate disposition of defendants' motions to suppress the seized property as evidence. In questioning the constitutional sufficiency of the description of the premises to be searched, defendants rely heavily upon the existence of a "breezeway" which interrupts the enclosed continuity of the building at 63 Park Street, and Agent Christopher's prior knowledge of the structure's multiple occupancy, i. e., the tenancies of business concerns other than Channel Building Company. With respect to the breezeway, the Court finds its existence and location to be of less than constitutional significance. To hold that the integrity of the structure, for purposes of description, is destroyed by the ability of an individual or vehicle to pass beneath a section of the roof into an enclosed courtyard is to ignore several persuasive realities: 1) the entire structure appeared to have been finished in the same building material; 2) the entire structure was painted barn red; 3) various parts of the entire structure abutted all four borders of the same rectangular lot; 4) the entire structure was numbered 63 Park Street; 5) one roof covered the entire structure; and 6) one sign, affixed to the front of the building, facing Park Street, identified each of the business concerns housed therein. In light of these uncontroverted facts, each an index of unity, the Court would strain reason and common experience to view the structure plurally.

██ Defendants' reliance upon Agent Christopher's knowledge of other occupants of the building is similarly misplaced. First, while Agent Christopher in fact realized that the structure served more than one business interest, he did not observe a sign identifying the location of Afro Imports, Inc.; it was defendant Casas who directed that the Frank J. Cole, Inc., truck be backed up to the loading platform. Nor did Agent Christopher know whether the defendants were associated with any of the tenants in the building, or whether there was internal access among Channel Building Company, the beauty parlor, and the locksmith shop. Agent Christopher's failure to question the tenants as to their possible connection with Afro Imports or the storage area, physical and otherwise, cannot be considered unreasonable under the circumstances appar-

ent to him at the time.[10] To have made such inquiries at 63 Park Street, at the very least, might well have jeopardized all chances of a successful investigation.[11]

In pursuing their broad-gauged challenge to the sufficiency of the description of the premises at 63 Park Street, the defendants next assert that the structure "could not possibly be described as a '2 story . . . structure, 208' long and 85' wide. . . .'"[12] Defendants draw the Court's attention to the varying height of the building, from a low of one story to a high of two and one-half stories, and question the accuracy of the lateral dimensions appearing in

10. It should be noted that Agent Robert J. Bishop, surveilling the premises while Christopher was en route to Cambridge, observed defendant Curwood exit the storage area of the building and enter that segment of the building occupied by Channel Building Company, using a door key. Transcript, at 305. A short time later, Curwood was observed to exit Channel and walk along the driveway out to Park Street. Five to ten minutes later, he returned to Channel Building Company, then walked back to the storage area. Transcript, at 305–306. Agent Bishop communicated these and other observations of defendants' movements about the premises to Christopher, and other agents, by radio. Transcript, at 332, 398–403. See United States v. Nagle, 34 F.2d 952, 956 (N.D.N.Y.1929).

11. Cf. United States v. Poppitt, 227 F. Supp. 73 (D.Del.1964), cited by defendants as setting forth the "applicable principles." In that case, the search warrant inaccurately described the house to be searched as a "one family . . . dwelling." In fact, defendant-owner occupied only the first floor and basement of the house, letting the second floor to three men as a furnished apartment. The apartment was not accessible to defendant, and the arresting officers, when informed by defendant that other persons lived on the second floor, refrained from entering that part of the house. The court rejected defendant's contention that, because the warrant directed the search of the house in its entirety, it lacked sufficient particularity under the Fourth Amendment. In so doing the court marshalled support for the view that "if an affiant has reasonable grounds for believing that an entire building should be searched, a warrant directing such a search should be sustained, even if it be later shown that affiant's belief was erroneous, provided the search is actually restricted to the part of the building to which the warrant should have been limited." 227 F.Supp. at 77.

In the present case, the affiant did not describe the premises in terms of single or multiple occupancy, he had reasonable grounds for seeking authority to search the entire building, it has not been shown that his belief was erroneous, and the search of the building in fact did not extend beyond the storage area of the building to which the crates had been delivered.

The *Poppitt* court also considered defendant's characterization of the problem as one of constitutional specificity of description to be a misconception: "The warrant on its face identifies the property to be searched, i. e., a house at 707 Lore Avenue, with sufficient precision to enable an officer with reasonable effort to ascertain and identify the place. This is all that the IV Amendment requires." The court cited Steele v. United States, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925); United States v. Joseph, 278 F.2d 504 (3d Cir. 1960), cert. denied, 364 U.S. 823, 81 S.Ct. 59, 5 L.Ed.2d 52 (1960). Rather, the court continued, the "question of description in the present context would appear to be one of probable cause." 227 F.Supp. at 76.

Applying these "applicable principles" to the case at bar, the Court finds defendants' reliance upon *Poppitt* to be self-defeating.

It should be noted that even if the Court were to determine that the description in the search warrant was overbroad, or that the warrant was issued without probable cause to search the entire premises, such a finding would not necessarily invalidate the search as actually conducted. See, e. g., United States v. Gomez, 42 F.R.D. 347 (S.D.N.Y.1967); Sasser v. United States, 227 F.2d 358 (5th Cir. 1955); Kenney v. United States, 81 U.S.App.D.C. 259, 157 F.2d 442 (1946); Shore v. United States, 60 App.D.C. 137, 49 F.2d 519 (1931); United States v. Nagle, *supra*; Fry v. United States, 9 F.2d 38 (9th Cir. 1925); United States v. Lepper, 288 F. 136 (W.D. N.Y.1923); United States v. Wihinier, 284 F. 528 (W.D.Wash.1922).

12. Defendants' Memorandum of Law in Support of Motions to Suppress, at 4.

the warrant. While the Government concedes that the building's height is not uniform, and it also appears that the dimensions of "208′ long and 85′ wide" include an uncovered courtyard and parking area external to the building itself, it is clear that defendants would require a more exacting description than that demanded by the Fourth Amendment.[13] In Steele v. United States, 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925), the Supreme Court held the description of a building as a garage used for business purposes, giving its street and one of its two house numbers, sufficiently definite to support a search warrant:

> "The description of the building as a garage and for business purposes at 611 W. 46th Street clearly indicated the whole building as the place intended to be searched. It is enough if the description is such that the officer with a search warrant can with reasonable effort ascertain and identify the place intended." (Citations omitted.)

In the present case, agents of the Bureau of Customs were not mistaken as to the identity of the place to be searched.[14] In fact, a number of agents remained at the scene while Agent Christopher obtained the search warrant.[15]

For the foregoing reasons, the Court holds that the search warrant secured by Agent Christopher on February 14, 1970, described with reasonable sufficiency the place to be searched, and was based upon probable cause to believe that illegally imported hashish could be found upon the premises at 63 Park Street, Andover, Massachusetts. In view of this holding, the Court need not, and does not, pass upon the validity of the search warrant under the customs laws of the United States, specifically 19 U.S.C. § 1595(a).[16]

Accordingly, defendants' motions to suppress the 400 pounds of hashish seized from the storage area of the building are denied.

2. The second aspect of defendants' motions to suppress concerns the seizure, without a search warrant, of approximately 200 pounds of hashish contained in two wooden footlockers found in the trunk of the yellow 1970 Plymouth sedan. The Government neither contends that the search of the vehicle was incident to a lawful arrest,[17] nor that the hashish was in "plain view" such that it could be seized without a warrant as an instrumentality of a crime.[18] Rather, the Government contends that the circumstances were "exigent," as a result of which a warrantless search was permissible. Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Alternatively, the Government supports the search as having oc-

---

13. It is interesting to note that the delivery address supplied to A & M Customs Brokers read simply "63 Park Street, Andover, Mass. (Channel Buildings)."

14. In this connection see United States v. Hassell, 427 F.2d 348 (6th Cir. 1970), in which asserted descriptive inaccuracies in an affidavit were held not to invalidate a search warrant obtained by one officer while three others remained on the scene. *See also* United States v. Ramos, 282 F.Supp. 354, 355 (S.D.N.Y.1968).

15. Defendants also rely upon the cases of King v. United States, 282 F.2d 398, 400 n. 4 (4th Cir. 1960) and United States v. Carignan, 286 F.Supp. 284 (D.Mass. 1967). Their reliance, however, is misplaced, as neither case is in point.

16. 19 U.S.C. § 1595(a) provides in pertinent part:

> "If any collector of customs or other officer or person authorized to make searches and seizures shall have cause to suspect the presence in any dwelling house, store, or other building or place of any merchandise upon which the duties have not been paid, or which has been otherwise brought into the United States contrary to law, he may make application, under oath, to any . . . Federal judge . . . and shall thereupon be entitled to a warrant to enter . . . and to search for and seize such merchandise. . . . "

17. See Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

18. See Coolidge v. New Hampshire, 403 U.S. 443, 464–473, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

curred subsequent to a customs seizure authorized by 19 U.S.C. § 1595a.[19] Yet a third proffered basis of the search is the coordinate authority to search automobiles conferred by 19 U.S.C. §§ 482 and 1581.[20] Put another way, the Government contends that the search of the vehicle was lawful as a "border search."[21]

In Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), a decision reaffirmed in Chambers v. Maroney, *supra,* the Supreme Court held that an automobile or other conveyance, because of its mobility, may be searched without a warrant in circumstances which would not justify such a search of a home or office, provided that there exists probable cause to believe that the vehicle contains contraband goods. In *Chambers,* petitioner was one of four men lawfully arrested in an automobile shortly after an armed robbery of a service station. The automobile was driven to a police station where a thorough, but warrantless, search was conducted. The search produced several items of incriminating evidence which petitioner sought to suppress. The Court, noting the time and place of the search, cited Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed. 2d 777 (1964), for its conclusion that the search could not be justified as incident to the arrest, however lawful.[22] Nevertheless, discerning "no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant," the Court upheld the search as reasonable under the Fourth Amendment.

Defendants contend that the Government's reliance upon *Chambers* can only be predicated upon a showing that Agent Desmond had probable cause to believe that the yellow Plymouth sedan contained merchandise which had been unlawfully introduced into the United States. *Carroll* expressly so holds.[23] Defendants further contend that Agent Desmond di-

19. 19 U.S.C. § 1595a provides in pertinent part:

"(a) . . . every . . . vehicle . . . used in, to aid in, or to facilitate . . . the importation . . . landing, removal, concealing, harboring, or subsequent transportation of any article which . . . has been introduced . . . into the United States contrary to law . . . shall be seized and forfeited . . . ."
See 19 C.F.R. § 23.3.

20. 19 U.S.C. § 482 provides in pertinent part:

"Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle . . . on which . . . he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle . . . or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle . . . or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States . . . he shall seize and secure the same for trial."

19 U.S.C. § 1581(a) provides in pertinent part:

"Any officer of the customs may at any time go on board of any . . . vehicle at any place in the United States . . . and search the . . . vehicle and every part thereof and any . . . trunk, package, or cargo on board . . . ."

21. *See, generally,* United States v. Weil, 432 F.2d 1320 (9 Cir. 1970); United States v. O'Brien, 265 F.Supp. 953 (D. Mass.1967); Corngold v. United States, 367 F.2d 1 (9th Cir. 1966); Leeks v. United States, 356 F.2d 470 (9th Cir. 1966); Ramirez v. United States, 263 F. 2d 385 (5th Cir. 1959).

22. Chambers v. Maroney, supra, 399 U.S. at 46–47, 90 S.Ct. 1975, at 1981.

23. Carroll v. United States, supra, 267 U. S. at 155–156, 45 S.Ct. at 280.

rected the search without probable cause to believe that the automobile contained contraband. Such a claim is without support in the record. The unrefuted testimony of Agent Desmond indicates that he arrived in Andover on February 14 at approximately 10:30 a. m.; that he parked his automobile in the vicinity of 63 Park Street; that he maintained radio contact with those agents assigned by him to keep the premises under surveillance; that such contact commenced as the delivery truck carrying Agent Christopher approached 63 Park Street; and that, upon direction of one Clifton Mentzer, referred to as "the special agent in charge," [24] Agent Desmond moved in with other agents to effect the arrest of defendants. It is also uncontroverted that Agent Bishop, who had assumed a surveillance position in a private dwelling at 65 Park Street, approximately forty feet from the loading platform at 63 Park Street, at 9:45 a. m. on February 14, personally observed the transfer of two wooden footlockers from the storage area of the building to the trunk of the automobile by defendants Casas and Curwood, and their placement of the footlockers into the trunk with the assistance of defendant Anthony W. King.[25] Significantly, Agent Bishop transmitted this information, and all other observations made by him during his surveillance of the premises that day, to the other agents maintaining radio contact, including Agent Desmond.[26] Moreover, when Bishop, with the assistance of Desmond and other agents, placed defendants under arrest, the lid of the trunk was observed to be open.[27]

 On these facts, Agent Desmond clearly had probable cause to believe that contraband could be found in the trunk of the yellow Plymouth sedan. Given probable cause to conduct the search, the question becomes whether a warrant was necessary to render that search lawful under the Fourth Amendment.[28]

In Chambers v. Maroney, *supra*, the Supreme Court stated that "[o]nly in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search." [29] The circumstances in *Chambers*, i. e., a stationhouse search of a vehicle conducted many hours after petitioner's arrest, were deemed sufficiently "exigent" to obviate the necessity of obtaining a search warrant. The exigency of the situation existing in the present case made imperative the course taken by Agent Desmond. The vehicle was being used for an illegal purpose; it contained contraband; it was being prepared for flight; and it was not "regularly parked in the driveway of [petitioner's] house." *Cf.* Coolidge v. New Hampshire, 403 U.S. 443, 460, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). It cannot be said that "the police knew of the presence of the automobile and planned all along to seize it." *Id.*, at 478, 91 S.Ct. at 2044. Only when it eventually developed that the automobile was being used for a criminal purpose did the agents determine to seize it and search the contents of its trunk.[30] To hold that, under such circumstances, the

---

24. Transcript, at 403.

25. *Id.*, at 309.

26. *Id.*, at 398–402.

27. *Id.*, at 312.

28. It is pertinent to reiterate that the Government does not contend that the search of the vehicle was incident to defendants' lawful arrest. The Court passes no judgment on the issue which would be raised by such a contention.

29. Chambers v. Maroney, *supra*, 399 U.S. at 51, 90 S.Ct. at 1981.

30. Agent Bishop testified that when he commenced surveillance of the premises from his vantage point at 65 Park Street, he observed three vehicles parked in front of the loading platform, none of which was a yellow Plymouth 4-door sedan. It was after the Frank J. Cole, Inc., truck carrying Agent Christopher had cleared the area that Bishop observed a yellow Plymouth leave the premises with two occupants, identified as defendants Curwood and King. Bishop had not seen the car enter the premises and, due to obstruction, had been unaware of its pres-

agents were required to secure another search warrant, during which time the automobile likely would have departed the scene with its cargo of contraband, is to impose a standard of official conduct not prescribed by the Fourth Amendment or by interpretive decisions of the Supreme Court. To suggest the practicability of obtaining a warrant to search the automobile after arresting defendants on the scene, and assigning a "special police detail to guard the immobilized automobile," [31] is to distort the Fourth Amendment concept of reasonableness.[32]

For the foregoing reasons, defendants' motions to suppress as evidence that quantity of hashish found in the trunk of the yellow 1970 Plymouth sedan are denied. In view of this disposition, the Court need not, and does not, pass upon the alternative contentions of the Government based upon the customs laws of the United States, specifically 19 U.S.C. §§ 1595a, 482, and 1581.

■ 3. Defendants seek to suppress as evidence "one, yellow-manilla envelope" seized pursuant to a search warrant issued on February 18, 1970, by a United States commissioner to "James R. Desmond or any other authorized Special Agent." [33] While the basis of their objection is not explicated in defendants' memorandum of law in support of their motions to suppress the envelope as evidence, the Court infers the following two-pronged challenge from the examination of Agent Desmond at the hearing by counsel for defendants: first, that the affidavit of Desmond failed to sufficiently state facts upon which a determination of probable cause could be made; second, that if the affidavit was valid on its face, the seizure authorized

---

ence prior to his observation of its departure. Approximately ten minutes later, Bishop observed the Plymouth's return with the same two occupants. Again it was parked out of Bishop's field of view, only later to be backed up to the loading platform by defendant King.

31. Coolidge v. New Hampshire, *supra*, 403 U.S. at 462, 91 S.Ct. at 2036.

32. Similarly, to require removal of the vehicle to a police station and subsequent application for, and issuance of, a search warrant is to ignore the teaching of Chambers v. Maroney, *supra*, 399 U.S. at 52, 90 S.Ct. at 1981: "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."

33. The Court notes that the Government does not deny defendants' standing under Fed.R.Crim.P. 41(e) to move to suppress the envelope, which it concedes to have been "part of first-class mail," as evidence. In United States v. Van Leeuwen, 414 F.2d 758 (9th Cir. 1969), the Government argued that appellant lacked standing to object to the seizure of two first-class packages containing gold coins by a Customs agent on the ground that he was neither the addressee nor the return

addressee of the packages. The court dismissed that contention summarily, citing Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), and held that the twenty-nine-hour detention of the packages by postal officials, allowing the agent to secure a search warrant, amounted to an unreasonable seizure under the Fourth Amendment, thus reversing appellant's conviction of illegally importing gold coins into the United States. The Supreme Court, in United States v. Van Leeuwen, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970), reversed, holding that such detention of the packages did not violate respondent's rights under the Fourth Amendment. In so holding, the Court declined to comment upon the issue of standing, and proceeded directly to the merits of the respondent's Fourth Amendment claim.

The issue of standing as it relates to multiple defendants has been the subject of considerable controversy. See McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Binkiewicz v. Scafati, 281 F.Supp. 233 (D.Mass. 1968); Rosencranz v. United States, 356 F.2d 310 (1st Cir. 1966); Rosencranz v. United States, 334 F.2d 738 (1st Cir. 1964). *See also* Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); Simmons v. United States, 390 U.S. 377, 390 n. 12, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Wright, Federal Practice and Procedure: Criminal § 674 and cases cited.

by the warrant was tainted by the illegality of the prior searches and seizures at 63 Park Street, rendering the envelope "fruit of the poisonous tree," and thus inadmissible as evidence at trial. The second contention is answered by the Court's denial of the motions to suppress as evidence the hashish seized on February 14, 1970. As to the first contention, "[i]t is elementary that in passing upon the validity of a warrant, the reviewing court may consider *only* information brought to the magistrate's attention." Aguilar v. Texas, 378 U.S. 108, 109, n. 1, 84 S.Ct. 1509, 1511, 12 L.Ed.2d 723 (1964), citing Giordenello v. United States, 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).[34] In the present case, there is no evidence of any information other than that contained in Agent Desmond's affidavit which was brought to the attention of the United States commissioner who issued the search warrant. Accordingly, the warrant must stand or fall solely on the contents of the affidavit, and the sufficiency of the affidavit must be determined from its face. Aguilar v. Texas, *supra;* Giordenello v. United States, *supra;* Wangrow v. United States, 399 F.2d 106 (8th Cir. 1968); United States v. Roth, 391 F.2d 507 (7th Cir. 1967). Information which is "subsequently adduced at a hearing on a motion to suppress . . . cannot be used by the trial court to augment an otherwise defective affidavit." United States v. Roth, *supra,* at 509.

The factual statement attached to the "Affidavit for Search Warrant," entitled "Affidavit," to which Agent Desmond swore in applying for the search warrant at issue reads precisely as follows:

## "AFFIDAVIT

"On February 13, 1970, Stephen T. Curwood caused to be filed with U. S. Customs at Boston, Massachusetts, two customs entries covering the importations of two shipments of merchandise said by him to contain 'musical instruments' and/or 'incense.'

The said entries reflected the shipments originated at New Delhi, India and were sent by the 'RIKHYE BROS.,' 'BHARAT EXPORT' to 'AFRO IMPORTS, P.O. BOX 441, Lawrence, Massachusetts.

Further, on February 13, 1970, both the said shipments were examined and found to contain hashish in hidden compartments.

On February 16, 1970, an undeliverable communication was returned to Afro Imports, Box 441, Lawrence, Massachusetts, the sender. It bore the following markings:

Addressee: Ravi Rikhye
c/o American Express
Vienna, Austria

Return Addressee: Afro Imports
P.O. Box 441
Lawrence, Mass.
01842, U.S.A.

In two places marked in red crayon the words 'VIA AIR MAIL' and 'First Class underscored. Also blue stamping 'return to sender-unclaimed'. Mailing date from the United States, December 4, 1969. The envelope is yellow-manilla color, and measures approximately 9" x 12".

I have determined that the subject communication is presently at the Lawrence, Massachusetts Post Office, in the custody and/or control of the Post Master.

In view of the fact that the addressee, 'RIKHYE' in the instance of the subject communication is the same name as that of the shipper, as reflected on the previously described customs entries, and; that the postmark date of December 4, 1969, on the subject communication and its subsequent return to the United States on or about, February 16, 1970, are of such close proximity in time as to give cause to believe that the subject communication is related to the smuggling

---

34. Spinelli v. United States, 393 U.S. 410, 413, n. 3, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

violation and may be a significant part of a conspiracy to smuggle hashish into the United States.

> s/ James R. Desmond
> JAMES R. DESMOND
> Assistant Special Agent in Charge
> Customs Agency Service
> Boston, Massachusetts"

In assessing the sufficiency of Desmond's affidavit, it may be helpful to review the decision of the Supreme Court in United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), reversing Ventresca v. United States, 324 F.2d 864 (1st Cir. 1963). In that case, the respondent was convicted in this court of possessing and operating an illegal distillery. The conviction was reversed by the Court of Appeals, one judge dissenting, on the ground that the affidavit for the search warrant pursuant to which the still was found was insufficient to establish probable cause. The applying agent, an investigator for the Alcohol and Tobacco Tax Division of the Internal Revenue Service, set forth in his affidavit a detailed statement of the grounds for his belief that an illegal distillery was being operated in respondent's home. His statement of those grounds was prefaced as follows: "Based upon observations made by me, and based upon information received officially from other Investigators attached to the Alcohol and Tobacco Tax Division assigned to this investigation, and reports orally made to me describing the results of their observations and investigation, this request for the issuance of a search warrant is made.[35] Following the factual recitation, the affidavit concluded: "The foregoing information is based upon personal knowledge and information which has been obtained from Investigators of the Alcohol and Tobacco Tax Division, Internal Revenue Service,

who had been assigned to this investigation.[36] The trial judge upheld the validity of the warrant on a motion to suppress. The divided Court of Appeals held the warrant defective, reasoning that "the affidavit failed to clearly indicate which of the facts alleged therein were hearsay or which were within the affiant's own knowledge. Although the affiant claims part of the information to be based upon 'personal knowledge and information,' it is stated that such 'personal knowledge and information' was obtained from other Investigators."[37] Inasmuch as the affidavit did not reveal whether the information obtained from other investigators was not in turn based upon hearsay received from unreliable informants rather than their own personal observations, the court found that probable cause had not been established and invalidated the search warrant.[38]

The Supreme Court granted certiorari to consider the standards by which a reviewing court should assess the sufficiency of affidavits supporting warrants which have been duly issued by examining magistrates.[39] Concluding that the Court of Appeals had given the affidavit "an unduly technical and restrictive reading," the Supreme Court reversed:

> "The affidavit in this case, if read in a commonsense way rather than technically, shows ample facts to establish probable cause and allow the Commissioner to issue the search warrant. The affidavit at issue here, unlike the affidavit held insufficient in *Aguilar* [*supra*], is detailed and specific." 380 U.S. at 109, 85 S.Ct. at 746.

Though the Court of Appeals recognized that an affidavit may be based upon hearsay "so long as a substantial basis for crediting the hearsay is presented,"[40] it invalidated the warrant because the affiant did not explain how the other in-

35. United States v. Ventresca, *supra*, at 103–104, 85 S.Ct. at 743.

36. *Id.*, at 104, 85 S.Ct. at 743.

37. Ventresca v. United States, *supra*, 324 F.2d at 868.

38. *Id.*, at 869.

39. United States v. Ventresca, 377 U.S. 989, 84 S.Ct. 1910, 12 L.Ed.2d 1043 (1964).

40. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

vestigators obtained their information. Stressing the precise wording of the affiant's preface and conclusion, the Supreme Court deemed the assumption that the source of the recited information ultimately might have derived from unreliable, anonymous informants to be without foundation. According to the Court,

> "[r]ecital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hyper-technical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. Jones v. United States, *supra*, 362 U.S. at 270, 80 S.Ct. at 725." 380 U.S. at 109, 85 S.Ct. at 746.

▇▇ In the present case, the affidavit of Agent Desmond plainly alleges ample facts which, in themselves, would warrant a finding that the property to be seized was probably related to the commission of the stated crime. The syntactically defective final paragraph—an incomplete sentence—cannot be held to invalidate the affidavit when read "in a commonsense way." Whatever infirmity this affidavit suffers stems not from its recital of "underlying circum-

stances," [41] but rather from its failure to state the source of the information presented.[42] Simple reference to the principle of *Ventresca*, predicated as it is upon an affidavit based at least in part upon the affiant's personal knowledge, fails to settle the question in favor of the warrant's validity. In rejecting a search warrant more closely resembling the instant affidavit than that sustained in *Ventresca*, the United States Court of Appeals for the First Circuit has indicated that "[i]f an affidavit is blind as to whether it is based on hearsay or not . . . [the] burden [of the party seeking a warrant] is not met." Saville v. O'Brien, 420 F.2d 347, 351 (1st Cir. 1969), cert. denied, 398 U.S. 938, 90 S.Ct. 1840, 26 L.Ed.2d 270 (1970). In *Saville*, a habeas corpus proceeding brought by a state prisoner, the affidavit asserted only that a detective had told affiant that a certain person "had stated" that the accused had given him counterfeit money at a print shop owned by the accused. Holding the affidavit insufficient on its face under the principles enunciated in Jones v. United States, *supra*, and amplified in Aguilar v. Texas, *supra*, the Court of Appeals distinguished *Ventresca* by noting that

> "[t]he affidavit in the instant case is readily distinguishable for there is no claim that the affiant had personal knowledge and there is no indication that the information he imparted to the clerk came from official, viz., reliable, sources. . . . To read this affidavit as anything but an open ended document giving no clue to the actual source of Detective Hurley's in- · formation, would go far beyond a 'commonsense interpretation.' " 420 F.2d at 350.[43]

41. Aguilar v. Texas, *supra*, 378 U.S. at 114, 84 S.Ct. at 1509.

42. At the hearing, Agent Desmond testified that, as part of the investigation, he initiated an inquiry to postal officials in Lawrence, Massachusetts, regarding the post office box number which appeared on the crates shipped from India. As a result of that inquiry, Desmond was informed by postal inspectors that the envelope

had been returned to the box bearing that number, and assigned to Afro Imports, Inc., as an undeliverable communication. This explanation, however, fails to appear on the face of the affidavit, and it is the face of the affidavit to which the present inquiry is necessarily limited.

43. Detective Hurley was not the affiant, but rather the source of the affiant's information. Hurley, according to the af-

■ The failure of Agent Desmond to disclose the source of the information presented in the affidavit is hardly remedied by the words, "I have determined . . . . " If the facts regarding the envelope and its probable connection with a conspiracy to smuggle hashish into the United States were within Desmond's own personal knowledge, then he should have so stated. Likewise, if the source of some portion or all of his information was an informant—even though he be a fellow investigator [44] or postal inspector [45]—that fact should have been drawn to the commissioner's attention through the affidavit. If "a basic policy of the Fourth Amendment is that the judgment of an independent magistrate should be interposed between the police and a suspect before an invasion of privacy is countenanced," [46] it cannot be said that the Desmond affidavit adequately subserves its constitutional purpose. Just as the affidavit condemned by the Supreme Court in Spinelli v. United States, *supra*, neither stated whether the affiant had personal knowledge nor, assuming he acquired his information indirectly, why his source should be considered reliable, the instant affidavit is singularly unenlightening as to how Desmond obtained the information upon which he relied in his application for the search warrant. Such a deficiency cannot be dismissed in a commonsense reading by a magistrate or reviewing court.[47] If an affiant must assert the basis of information supplied by an informant to enable a "disinterested judicial officer" [48] to make an independent determination of the informant's reliability, or the credibility of such information,[49] *a fortiori* an affiant who sets forth facts in an affidavit without mention of an informant, named or unnamed, must allege the basis of his personal knowledge of such facts.[50] The words, "I have determined," without more, are wholly ambiguous as to whether Desmond himself had knowledge of the facts upon which he relied or whether his information was acquired from another source. An issuing magistrate could not base a determination of probable cause upon such fundamental ambiguity "without abdicating his constitutional function." [51]

Accordingly, the Court holds that the search warrant of February 18, 1970, pursuant to which the yellow manilla envelope was seized, was improperly issued, and grants defendants' motions to suppress such yellow manilla envelope as evidence.

fiant, received his information from a named informant. Saville v. O'Brien, *supra*, 420 F.2d at 348.

44. See United States v. Ventresca, *supra*.

45. See note 43, *supra*.

46. Saville v. O'Brien, *supra*, 420 F.2d at 349.

47. As the Court of Appeals said in Rosencranz v. United States, 356 F.2d 310, 317 (1st Cir. 1966), "[i]t is one thing to expect the magistrate to give a commonsense reading to facts set forth and to draw inferences from them. It is quite another thing to expect the magistrate to reach for external facts and to build inference upon inference in order to create a reasonable basis for his belief that a crime is presently being committed."

48. Spinelli v. United States, *supra*, 393 U.S. at 419, 89 S.Ct. at 584.

49. Aguilar v. Texas, *supra*.

50. Spinelli v. United States, *supra*, 393 U.S. at 423–424, 89 S.Ct. at 584.

51. *Id.*, at 415–416, 89 S.Ct. at 584.